# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---
### NO. 03-17-00726-CR
---

**Travis Thornton, Appellant**

**v.**

**The State of Texas, Appellee**

---
### FROM THE 403RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-17-904041, THE HONORABLE BRENDA KENNEDY, JUDGE PRESIDING
---

### M E M O R A N D U M   O P I N I O N

A jury found appellant Travis Thornton guilty of continuous sexual abuse of a young child for sexually abusing his stepdaughter, *see* Tex. Penal Code § 21.02(b), and assessed his punishment at confinement for thirty-eight years in the Texas Department of Criminal Justice, *see id.* § 21.02(f). On appeal, appellant complains about the admission of hearsay evidence and lay-opinion testimony. Finding no reversible error, we affirm the trial court's judgment of conviction.

### BACKGROUND

The evidence at trial showed that G.W. has an intellectual disability and speech impairment and, as a result, received special education services at school.[1] In December 2015, G.W., then eleven years old, was caught kissing a boy at school. Her teachers discussed the

---

[1] To protect the identity of the child victim in this case, we refer to her using only her initials and refer to her mother using her first name. *See* Tex. R. App. P. 9.10(a)(3).

incident with G.W., explaining to her that kissing at school was not allowed. During the discussion with her special-education teacher, G.W. revealed that "her dad kissed her all over her body." The evidence at trial showed that the "dad" G.W. referred to was not her biological father but her stepfather, appellant. Appellant had known G.W. since her birth, lived in the same home with her for most of her life, and married her mother, Judy, when G.W. was eight. After G.W.'s comment, a report was made to Child Protective Services, and a CPS investigation and a criminal investigation ensued.

Following the criminal investigation, appellant was indicted for continuous sexual abuse of a young child. *See id.* § 21.02(b). After a trial, the jury found appellant guilty and assessed his punishment at thirty-eight years in prison. This appeal followed.

## DISCUSSION

Appellant raises two points of error challenging the trial court's evidentiary rulings. First, he contends that the trial court erred by admitting hearsay testimony about the initial call that Judy received from CPS. Second, appellant asserts that the trial court erred by admitting certain portions of a CPS investigator's testimony because he lacked the personal knowledge to offer a lay opinion.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery*

2

*v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)); *accord Rhomer*, 569 S.W.3d at 669. Further, we may not reverse the trial court's ruling unless the determination "falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see Henley*, 493 S.W.3d at 83 ("Before a reviewing court may reverse the trial court's decision, 'it must find the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008))). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93; *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

### Hearsay Evidence

During trial, the State called Patricia Gray as a witness. The record reflects that Judy, G.W.'s mother, was friends with Gray's daughter, Nicole. At some point before G.W. or her brother were born, Judy moved into the Grays' home and lived with Nicole and her parents, Robert and Patricia. Although not officially adopted, the Grays considered Judy their daughter and her children their grandchildren. Judy, her children, and appellant were living with the Grays at the time of the kissing incident at school.[2]

At trial, Gray testified about Judy telling her about the phone call from CPS:

Q. What was Judy's reaction? What was her reaction?

A. When she got the call, I was not there.

---

[2] The evidence at trial showed that Judy, her children, and appellant had been living in the Gray's home for years. The Grays decided to renovate their home, in part to accommodate everyone living in the home. During the renovations, the group moved into an apartment. At the time of the kissing incident, they had just moved into the apartment.

3

Q.    You were not there?

A.    No, sir.

Q.    What happened after she got the call when you were there?

A.    She was extremely upset and wanted to tell me about it.

Q.    What did she say?

A.    That the CPS called and that [appellant] had done something.  She didn't give me all the details at that time.

At that point, appellant objected on hearsay grounds.  The prosecutor responded that the "excited utterance" hearsay objection applied.  The trial court explained that the State would need to lay the predicate for that exception.  The prosecutor then asked Gray questions about Judy's demeanor when she told Gray about the CPS call:

Q.    When you said she was upset, can you explain that?  Was she speaking quickly?

A.    Yes, she gets to stuttering and shaking.

Q.    Was she breathing fairly rapidly?  Did she —

A.    Yes.

Q.    — seem startled?

A.    She was upset.

Q.    Was she crying?

A.    I would like say it's like furious, that look when she sticks her lip out and she was just extremely upset.

Q.    Was she talking quickly?

A.    Uh-huh.

Q.      Is that a yes?

A.      Yes.  Sure.

Q.      What did she say?

A.      She told me that the Child Protective Services called —

Appellant interrupted to renew his hearsay objection.  The trial court overruled the objection. Gray testified about what Judy told her:

> That the Child Protective Services had called.  And I said — you know, you kind of go, what?  And she said, It's about [appellant].  And I said, Well, what happened?  And she said, He touched her.  I think she told me at that time it was the breasts, that he touched her breasts.

In his first point of error, appellant argues that the trial court erred by admitting Gray's testimony about Judy's statement concerning what CPS related to her about appellant's conduct because the testimony did not fall under the "excited utterance" hearsay exception.[3]

Hearsay is a statement, other than one made by the declarant while testifying at a trial, offered in evidence to prove the truth of the matter asserted.  Tex. R. Evid. 801(d).  Hearsay is generally inadmissible except as provided by the rules of evidence or statute.  Tex. R. Evid. 802.  The trial court admitted the complained-of testimony under the excited-utterance exception

---

[3] To the extent that appellant complains about Gray's testimony that appellant "had done something," we note that this complaint is not preserved for appellate review as the question "What did she say?" had already been asked and answered.  *See* Tex. R. App. P. 33.1(a)(1) (party must preserve complaint with timely objection); *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012) ("The requirement of a timely trial-level complaint is satisfied 'if the party makes the complaint as soon as the grounds for it become apparent[.]'" (quoting *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)); *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008) ("If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited.").

5

to the hearsay exclusion. *See* Tex. R. Evid. 803(2). This exception allows the admission of out-of-court statements relating to a startling event or condition made while the declarant is under the stress of excitement caused by the event or condition. *See id.* For the excited-utterance exception to apply, (1) the exciting event must be startling enough to evoke a truly spontaneous reaction from the declarant, (2) the reaction to the startling event must be quick enough to avoid the possibility of fabrication, and (3) the resulting statement should be sufficiently "related to" the startling event to ensure the reliability and trustworthiness of that statement. *McCarty v. State,* 257 S.W.3d 238, 241–42 (Tex. Crim. App. 2008).

We need not decide whether the testimony at issue fell within the excited-utterance hearsay exception because, assuming without deciding that the trial court abused its discretion in admitting the complained-of testimony, we conclude that the error is harmless.

The erroneous admission of evidence is non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim. App. 2007). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* Tex. R. App. P. 44.2(b); *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93. "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *see Gonzalez*, 544 S.W.3d at 373. We will not overturn a criminal conviction for non-constitutional error if, after examining the record as a whole, we have fair assurance the error did not influence the jury or influenced the jury only slightly. *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 93.

In assessing potential harm, our focus is not on whether the outcome of the trial was proper despite the error but on whether the error had a substantial or injurious effect or influence on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94; *Sandoval v. State*, 409 S.W.3d 259, 287–88 (Tex. App.—Austin 2013, no pet.). We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Barshaw*, 342 S.W.3d at 93; *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010) (in conducting harm analysis "we examine the entire trial record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence"). In making this determination, we consider: (1) the character of the alleged error and how it might be considered in connection with other evidence; (2) the nature of the evidence supporting the verdict; (3) the existence and degree of additional evidence indicating guilt; and (4) whether the State emphasized the complained of error. *Gonzalez*, 544 S.W.3d at 373; *Barshaw*, 342 S.W.3d at 94; *Motilla v. State*, 78 S.W.3d 352, 356–58 (Tex. Crim. App. 2002).

The State called thirteen witnesses at trial: two of G.W.'s teachers, who testified about the kissing incident at school and the ensuing discussions with G.W.; an investigator from Child Protective Services, who testified about the CPS investigation of the possible inappropriate contact between appellant and G.W.; G.W.'s mother, Judy, who testified about G.W.'s disabilities and her relationship with appellant; a child-abuse pediatrician, who testified about the sexual-assault exam she performed on G.W.; a forensic interviewer from the children's advocacy center, who testified about the forensic interview of G.W.; the grandparent figures in G.W.'s life, Robert and Patricia Gray, who testified about their conversations with appellant about the alleged inappropriate sexual conduct; G.W.'s speech and language therapist, who explained G.W.'s disabilities and how they impact her ability to communicate; G.W., who described the sexual

7

abuse that appellant had perpetrated against her; a detective from the sheriff's office, who testified about her interview of appellant; a child-abuse expert, who testified about the dynamics of child sexual abuse; and appellant's mother, who testified about a phone conversation that she had with her son when he was in jail. Appellant testified on his own behalf.

The record reflects that Gray testified only very briefly about what Judy told her about the information related to her in the CPS call. Her testimony was only a small portion of the trial evidence, and the complained-of testimony was only a small portion of Gray's testimony. Significantly, the State did not emphasize her testimony beyond introducing it. The State did not mention Gray's testimony about what Judy told her about the CPS call at all during the rest of trial, and the prosecutors did not mention it during closing argument.

Concerning the nature of the evidence supporting the verdict, the jury heard details about the sexual abuse that appellant perpetrated from G.W. during her testimony, when she used anatomically correct dolls to show what appellant had done to her. In addition, the child-abuse pediatrician testified about the details of the sexual abuse that G.W. described to her (with words and gestures) during the sexual-assault exam she performed. The medical records relating to the exam were admitted at trial. The record reflects that the details that G.W. gave to the doctor about the sexual abuse were consistent with G.W.'s testimony at trial. Similarly, the forensic interviewer from the children's advocacy center testified about the sexual abuse that G.W. recounted to her through the use of anatomically correct dolls. A video recording of the forensic interview was admitted at trial.[4] The record reflects that G.W.'s descriptions to the forensic interviewer were consistent with G.W.'s testimony at trial.

---

[4] After appellant's cross examination of the forensic interviewer, the State sought to admit the recording of the forensic interview because, according to the State, appellant's

Further, the record demonstrates that similar evidence about appellant touching G.W.'s breasts was admitted without objection. First, Judy testified that, after receiving the phone call from CPS, she confronted appellant and appellant admitted to her that he had touched G.W.'s breasts. In addition, Gray testified that she asked appellant "to his face did [he] really touch her bare skin, did [he] touch her breasts like that," and that appellant "said yes," acting like "[n]othing was wrong with that." Similarly, Gray's husband, Robert, testified about an encounter that he had with appellant where he "asked [appellant] what had happened, if he had touched [G.W.] in any way, and he said he just touched her breasts."

Moreover, the record contains repeated admissions by appellant to others that he not only touched his stepdaughter's breasts but perpetrated additional acts of sexual abuse against her. First, Nathan Chacona, the CPS investigator, testified about the phone interview he had with appellant as part of the CPS investigation. Chacona revealed that, during that phone conversation, appellant admitted to Chacona that he had touched G.W.'s breasts, both over and under her clothing, and that G.W. had touched appellant's "private area" over his clothing.

In addition, appellant's mother testified about a conversation she had with her son when he was in jail awaiting trial, and a recording of the phone conversation was admitted at trial. During that conversation, appellant confirmed to his mother that he had been arrested for sexual assault of a child. His mother asked if "it was really true," and appellant said, "To some

---

questioning left the misleading impression that the interviewer had conducted the interview in a leading and suggestive manner. The trial court admitted the recording of the forensic interview to correct the false impression. *See Hayden v. State*, 296 S.W.3d 549, 554 (Tex. Crim. App. 2009) ("Evidence that is otherwise inadmissible may become admissible when a party opens the door to such evidence. A party opens the door by leaving a false impression with the jury that invites the other side to respond.") (internal citations omitted).

degree." Later, appellant's mother asked him if he thought that G.W. was "creating stories." Appellant said, "No."

Furthermore, Amber Moore, a detective with the Travis County Sheriff's Office, interviewed appellant. That interview was recorded, and a copy of that recording was admitted at trial. In the interview, appellant admitted to engaging in various sexual acts with G.W., including touching her bare breasts with his hands, kissing her breasts over her clothing, touching her vagina under her clothing with his hand, rubbing her vagina with his fingers and penetrating her slightly, causing her to touch and rub his erect penis, causing her to kiss the tip of his erect penis and put it (the tip) in her mouth, and rubbing his penis against her vagina. Appellant told Detective Moore that he was "more open minded than some people" and explained that he was showing G.W. affection and teaching her to understand "the different aspects of male and female." He admitted that he had been "educating" G.W. for several months, from about late August until December.

Finally, appellant testified at trial and admitted the alleged sexual-abuse conduct. He acknowledged that, although he was not G.W.'s biological father, he had "been [her] father ever since she was born." He explained that, because of her disabilities, G.W. has to go through a process of repetition in order to learn. He expressed that he felt that she needed answers relating to puberty (that were not being given by her mother or grandmother) to better grasp what was happening to her biologically. Appellant admitted that he and G.W. "had a lot of interaction" from roughly August through December, which included appellant touching G.W.'s naked breasts, having her lie on him when they were both naked and contacting her vagina with his penis, having her sit in his lap when they were both naked and contacting her vagina with his penis, penetrating her vagina with his fingers (but "only to a small degree"), having her

10

manipulate his penis with her hand, and causing her to put her mouth on his erect penis and put the tip of his penis in her mouth. Although appellant admitted committing the various acts of sexual abuse, he insisted that he did not force G.W. to do anything—they did "only what she was comfortable with"—and explained that he simply gave his eleven-year-old stepdaughter "the freedom to express herself."

On this record, we have "fair assurance" that the improper admission of the challenged portions of Gray's testimony about Judy's statements concerning the CPS phone call, if it was error, did not influence the jury or had but a slight effect. Thus, because it did not affect appellant's substantial rights, it was harmless. We overrule appellant's first point of error.

**Lay-Opinion Testimony**

At trial, Nathan Chacona, the investigator with CPS, testified about the investigation concerning appellant's alleged inappropriate sexual contact with G.W. that he conducted on behalf of the Texas Department of Family and Protective Services. Chacona stated that he met with G.W. at her school in January after school resumed following the holiday break. He recounted that G.W. told him that her dad kissed her and "made her feel weird." In response to Chacona's questions, G.W. indicated that appellant had kissed her on the lips but not anywhere else. Because G.W. did not make an outcry of sexual abuse, Chacona was prepared to close the investigation. Before doing so, however, he needed to interview appellant.

Chacona said that he interviewed appellant by phone. He recounted that, during that phone conversation, appellant admitted that he had touched G.W.'s breasts "over her shirt but maybe up her shirt" and that G.W. had touched appellant's "private area" outside of his clothes. According to Chacona, appellant said that he wanted to give G.W. an avenue to explore

11

herself in a safe environment. After Chacona testified about what appellant had told him, the prosecutor asked the CPS investigator what his reaction was. Chacona said that he was "shocked" because "[he] had never had that happen before." He explained that "once he got that detail, [he] cut off the conversation at that point." When the prosecutor asked why, Chacona explained,

> With children and adults both, I mean, I'm an investigator, you know, I'm trained to do basic interviews with the parents and the kids, but we don't interrogate. That's not my job. And from when I had heard a crime had been committed and I — so I decided to cut it off and kind of leave it up to the professionals at that point and let the detective know what I had heard and kind of let her roll with it from there.

The prosecutor then asked Chacona if, after talking to appellant, he was still planning to close his investigation. He stated that he was, "just in a different way this time." The prosecutor asked what that different way was, and appellant objected, complaining that the question "call[ed] for a legal conclusion." The prosecutor responded that "it's his departmental policy, it's what he did next and how he proceeded next." The trial court overruled the objection.

In answering the question, Chacona explained that he misspoke, that the case would remain open instead of being closed. He then said that he spoke with the detective from the sheriff's office to tell her about his conversation with appellant. Chacona explained:

> Again, after I had gotten the confession from him, it was in her court. And so she — since I had spoken to [G.W.'s mother] in the past and had somewhat of a rapport with her, she asked that I call her up, give her basically as little details as possible but let her know that a forensic interview needed to be done.

He then testified about setting up the forensic interview for G.W., which, he indicated, concluded his actions in the CPS investigation.

12

In his second point of error, appellant asserts that the trial court erred by allowing Chacona to give his "non-expert conclusion that a crime had been committed, or that the Appellant had confessed to any crime." He maintains that this testimony failed to meet the requirements of lay-opinion testimony.

"As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion." Tex. R. App. P. 33.1(a)(1). To be timely, an objection must be made at the earliest opportunity or as soon as the grounds for the objection become apparent. *See Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014); *Pena v. State*, 353 S.W.3d 797, 807 (Tex. Crim. App. 2011). In other words, the objection should be made "as soon as the [objecting party] knows or should know that an error has occurred." *Lackey v. State*, 364 S.W.3d 837, 843 (Tex. Crim. App. 2012); *Hollins v. State*, 805 S.W.2d 475, 476 (Tex. Crim. App. 1991). If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely, and any claim of error is forfeited. *Luna v. State*, 268 S.W.3d 594, 604 (Tex. Crim. App. 2008); *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997).

Here, the earliest possible opportunity for appellant to have objected to Chacona's testimony that "a crime had been committed" was when the CPS investigator made the allegedly objectionable statement. Appellant, however, did not object at that time. Instead, Chacona completed his answer. The prosecutor then propounded the next question, asking if Chacona was still planning to close the CPS investigation, and Chacona answered that question. The prosecutor then propounded the next question about the "different way" of closing the CPS investigation, after which appellant objected. Appellant's objection was untimely. Moreover,

13

the record here demonstrates that appellant was objecting to the question about Chacona closing the CPS investigation in a different way. It does not indicate that the objection raised was to Chacona's comment that a crime had been committed. Concerning appellant's complaint about Chacona's testimony that appellant had confessed to a crime (when Chacona said that "[he] had gotten the confession from [appellant]"), the record demonstrates that appellant did not object to this testimony at all.

Because appellant did not timely object, or failed to object at all, to the complained-of testimony, he failed to preserve his complaint for appellate review.

Moreover, even if appellant had properly preserved his complaint about this testimony for appellate review, and assuming arguendo that the trial court abused its discretion in admitting the testimony at issue, for the reasons stated in our discussion of appellant's first point of error, we conclude that any such error is harmless. *See* discussion *supra* pp. 7–11.

For the above reasons, we overrule appellant's second point of error.

## CONCLUSION

Having concluded that the erroneous admission of Gray's testimony about Judy's statements about the information conveyed in the phone call from CPS, if it was error, was not harmful and that appellant failed to preserve his complaint about the admission of the complained-of portions of the CPS investigator's testimony, we affirm the trial court's judgment of conviction.

14

_____

Edward Smith, Justice

Before Justices Baker, Triana, Smith

Affirmed

Filed:   August 21, 2019

Do Not Publish